Fred W. Fairman, Jr., and Carolyn (Caryl) Ely Smith v. Commissioner.
Fairman v. Commissioner
Docket No. 95230.
United States Tax Court
T.C. Memo 1964-229; 1964 Tax Ct. Memo LEXIS 109; 23 T.C.M. (CCH) 1381; T.C.M. (RIA) 64229; August 28, 1964
Sharon L. King for the petitioners. Joseph T. deNicola for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent has determined deficiencies in income tax for the years 1956 and 1957 as follows: Year
Deficiency
1956
$ 4,844.93
1957
13,682.40 Petitioners having conceded all other adjustments except a medical expense deduction for 1957, which amount is dependent on the outcome of this case, the sole issue to be decided is whether petitioners are entitled to deductions for legal fees paid in 1956 and 1957. Findings of Fact The stipulated facts are hereby found accordingly. Petitioners Fred W. Fairman, Jr. (hereinafter sometimes referred to as Fairman) and Carolyn (Caryl) Ely Smith (hereinafter sometimes referred to as petitioner) were husband and wife during 1956 and 1957 and resided in Chicago, Illinois. They timely filed joint returns in each of those *111 years with the district director of internal revenue, Chicago, Illinois. Fairman presently resides in Fairfield, Connecticut, [1] and petitioner presently resides in Pasadena, California. Petitioner is the great-granddaughter of Jay C. Morse (hereinafter sometimes referred to as Morse), who died onaugust 22, 1906, a resident of Georgia. Morse, by his last will and testament dated November 9, 1904, created a testamentary trust (hereinafter also referred to as the Morse trust). Following the death of Morse's widow, who died on June 26, 1927, the entire income from the Morse trust, under its terms, was to be paid to Morse's daughter, Carrie Morse Ely (hereinafter sometimes referred as to Carrie) for life. Upon the death of Carrie, the trust property was to be distributed to her child or children, or the issue of such child or *112 children then surviving, per stirpes. From June 26, 1927, until her death on July 24, 1954, Carrie was the income beneficiary of the Morse trust. On May 11, 1933, Jay Morse Ely (hereinafter sometimes referred to as Ely), Carrie's only child, died intestate at the age of 43 while his mother was still living. He left his widow, now known as Josephine Hamline Grannis (hereinafter sometimes referred to as Josephine), and three children, Jay Morse Ely, Jr. (hereinafter sometimes referred to as Jay, Jr.), Adrienne Ely Grannis (hereinafter sometimes referred to as Adrienne), and petitioner, as his sole heirs at law and next of kin. Ely, on November 2, 1926, entered into an indenture of trust under which The First National Bank of Chicago became trustee. Under the terms of the indenture, Ely assigned, transferred, and set over, to be held in trust, 50 percent of all his right, title, interest and estate, present and future, of whatsoever nature under the will of his grandfather, Morse. The trustees were to pay to Josephine, during and throughout her natural lifetime, the entire net income derived from the trust estate created by Ely. Josephine was given a power of appointment and disposition *113 of the trust estate upon her death. In the event of default of the exercise of this power of appointment and disposition, the trust estate, upon Josephine's death, was to be divided equally among the Elys' three children. On December 25, 1935, during Josephine's widowhood, petitioner and her brother Jay, Jr., made in duplicate and delivered to Josephine two instruments. These instruments were identical in form and terms with the exception of minor variations attributable to the fact that one of the instruments was made and signed solely by petitioner and the other was made and signed solely by Jay, Jr. These two instruments (hereinafter sometimes referred to as Christmas Day agreements) were made for Josephine's financial advantage and benefit. The Christmas Day agreements were drawn up by Walter B. Wolf (hereinafter sometimes referred to as Wolf), an attorney and partner in the firm of Wolf & Davis of Chicago. Each of the Christmas Day agreements provided that in the event the November 2, 1926, indenture of trust entered into by the maker's father, Ely, was legally effective or became legally effective upon the termination of the Morse trust, then the maker confirmed the terms *114 and provisions of Ely's indenture. Each agreement further provided that in the event the indenture was not legally effective or did not become legally effective at the termination of the Morse trust, all the right, title, interest and estate of the maker in and to the Morse trust estate would be transferred to trustees named in the agreement. An exhibit accompanying each Christmas Day agreement stated, inter alia: The uses, purposes and trusts referred to in * * * the foregoing instrument * * * shall be operative if Josephine * * * shall be living on the date of the termination of the [Morse] trusts * * *, but not otherwise and if operative are hereby declared to be irrevocable * * *. The trustees of the Christmas Day agreements, after receipt of the funds from the Morse trust, were to give Josephine $10,000 outright, free of trust, as reimbursement for certain payments she had previously made from her own funds. They were further to give $30,000 outright, free of trust, to any person or persons (including the maker) designated by the maker. The remainder of the Morse trust funds were to be held in irrevocable trust until Josephine's death, with the trustees to pay her 35 percent *115 of the net income yearly, or, if that sum in any particular year were less than $6,500, 40 percent of the net income for that year. The balance of the net income was to be paid to the maker or his heirs. Upon the death of Josephine, the corpus was to go to the maker; there was provision for the event that the maker predeceased Josephine. On December 2, 1944, the three children (petitioner, Jay, Jr., and Adrienne), as contingent "remaindermen of the principal of the [Morse] trust" requested the trustee of that trust to: advance to each of us severally, or pay out on the separate order of each of us, respectively: (a) On February 1, 1945 the sum of $2,500.00; and (b) The sum of $6,000.00 yearly in each calendar year, commencing with the year 1945, and continuing until the date on which said trust shall be completely liquidated or there shall have been paid out pursuant to this request the aggregate sum of $160,000.00, whichever of those two dates may first occur, it being requested that said annual payments be made on March 15, June 15, September 15 and December 15 unless otherwise directed from time to time by the undersigned or by one of them separately as to him or her. *116 On January 16, 1945, the trustee of the Morse trust entered into an Agreement of Reimbursement and Indemnity (hereinafter sometimes referred to as the Indemnity Agreement) with the three children and Carrie, [2] the income beneficiary. The Indemnity Agreement provided that the trustee was willing to meet the request of the three children for advances to the extent of $25,500 payable during the calendar year 1945 and to act on the request in the future on a year-to-year basis. The three children agreed to indemnify and save harmless the trustee from any loss, cost and expense to which it might be put as a consequence of any payment made. To effectuate the reimbursement and indemnity provisions, the three children agreed that the trustee was to charge the principal of the trust on the complete liquidation of the trust. The Indemnity Agreement was effected due to the efforts of Wolf and his persuasiveness on behalf of the three children. Wolf, on August 10, 1949, wrote to a Cleveland attorney in reference *117 to the possibility of obtaining a construction of the Morse will prior to Carrie's death. A copy of the letter was sent to the trustee of the Morse trust. Wolf stated that: I think you can see from what I have told you about the general situation in which the life and remainder beneficiaries of the Morse Trust find themselves that a present judicial construction, rather than one awaiting the death of the life tenant * * * [Carrie] is more than desirable. Furthermore, it would advance the establishment prior to * * * [Carrie's] death of the trust with The Cleveland Trust Company on the part of the male remainderman which he discussed * * * but might be unwilling to establish once he obtained possession of such a large distribution as that to which he will, if he survives, be entitled. * * * Wolf suggested that the Cleveland attorney, in connection with his reply, consider the Uniform Declaratory Judgments Act, which Ohio had adopted. J. P. McGean, Assistant Trust Officer of The Cleveland Trust Company, trustee of the Morse trust, wrote Wolf, on August 12, 1949, that the trustee had noted with interest Wolf's proposal that the successions upon Carrie's death be judicially determined *118 prior to her demise. McGean further stated: Needless to say, we fully approve and hope that * * * [the Cleveland attorney] will find the course legally permissible. On August 18, 1949, the Cleveland attorney, in reply to Wolf's letter of August 10, commented: [The] possibility and, if possible, the desirability of obtaining a construction of Mr. Morse's will at this time will of course require some study. I had understood that we would probably have to have a construction of Mrs. Morse's will, but until I received your last letter, I had supposed that our action to construe would be brought after the death of * * * [Carrie]. I will consider this question and talk with * * * some one at the Bank about it because I presume that you would not want to institute the suit now unless we had the Bank's approval. On February 24, 1950, Wolf wrote to E. T. Bartlett, vice president of The Cleveland Trust Company. After the mention of other matters and the citation of cases on the question of a declaratory judgment, the letter concluded: I shall much appreciate if * * * you will let me know whether any decision has been reached as to proceeding at this time via the declaratory judgment *119 course and, if so, its nature or scope. * * * I. F. Freiberger, Chairman of the Board of The Cleveland Trust Company, wrote Wolf on March 7, 1950, that: * * * [Mr. Bartlett] and I have been reviewing some of our old correspondence and various memoranda made at different times that seemed to relate to the question as to whether or not the three grandchildren of * * * [Carrie] have vested rights. It is my recollection that when you and we were seeking to make funds available for these grandchildren, with your concurrence we had to resort to the procedure that was followed because the doubt existed as to whether or not these grandchildren had vested rights. * * * Mr. Bartlett forwarded to Ed Merrick [son of the Cleveland attorney, who had retired] the copy of your letter of February 24 and we have just finished talking with him on the phone. Informally, he expressed his confidence that a proceeding for construction could be filed under our Declaratory Judgment Act. I urged that he and his associates give further and prompt consideration to this matter and anticipate that you will hear from him or that he will confer with us with the view then to communicating with you. *120 My hasty review of our files leaves me uncertain as to whether or not it was your desire in this proceeding not only to ascertain the question of the vested rights of the grandchildren but also the question as to whether or not the father had a vested right at the time that he entered into the agreement with the First Trust and Savings Bank. It is clear to me that this latter question was not to be submitted until the death of * * * [Carrie]. Wolf replied to Freiberger in a letter dated March 8, 1950: Perhaps my previous correspondence on this subject has left it uncertain that I feel that the nature of the present interests of the grandchildren and the interest of the First National, here, as the trustee under the trust agreement made by * * * Ely, are interacting and interrelated so that, as I have read the will on the question of contingency, a judicial interpretation at this time should settle both questions in their entirety. I well recall our conversation, and possibly that a memorandum was made of it, to the effect that the status of First National, as trustee, if any, should be determined immediately after * * * [Carrie's] death, but, due to surface symptoms and *121 complications which may become inevitable at her death, I was forced to the conclusion during last summer, which I believe I mentioned to Mr. McGean over the telephone, that, if the required interpretation proceedings could be had presently, the difficulties that would result from reasonable delay in getting them through after death required me to bring the question discussed in your letter to a head at this time. On September 23, 1952, Wolf wrote the following letter to Bartlett: Replying to your telephone inquiry earlier this morning, I have gathered from the attitude expressed by Mr. Fairman for one of the principal beneficiaries in the Jay C. Morse trust estate that the call, - during the base period on about 11.5 shares of Standard Oil of Indiana capital stock per $1,000 of its convertible debentures, 3 1/8's, for which the rights have now gone out to its stockholders, or on a total of 287 1/2 shares were all rights to be exercised by the acquisition of $25,000 in new debentures - is not considered a necessary supplement to the trust estate's present holding of a total of 2,730 shares. Although this opinion is voiced on behalf of but one of the three such beneficiaries, it *122 points to the desirability of selling the rights relating to the entire holding and, accordingly, after hearing the views on this subject of Mr. Freiberger and yourself over the telephone today, I now indicate it to be my choice that all such rights be sold at the market. Petitioner and Jay, Jr., on April 22, 1953, filed a complaint in case No. 58551, in the Circuit Court of Lake County, Illinois. Defendants in this action were their mother, Josephine, their sister, Adrienne, the two minor children of Jay, Jr., the three minor children of the petitioners, and the possible initial co-trustees of certain potential trusts, Elton Hoyt, 2d, and The Cleveland Trust Company. The plaintiffs sought rectification and reformation of the Christmas Day agreements. They requested the insertion into the agreement of, inter alia, the following paragraph, which the plaintiffs contended was inadvertently omitted from the agreements: 3. This instrument shall, anything therein to the contrary notwithstanding, be inoperative and become of no force or effect if said Adrienne * * * shall have attained the age of 18 years and, within a reasonable time after attaining that age, shall not have made, and *123 forthwith after her making have delivered to her Mother Josephine * * *, an instrument of like form, scope, terms, import and effect as * * * [the Christmas Day agreements]. The plaintiffs gave the following reasoning for the request: (1) The making of each instrument so made on December 25, 1935 was initiated by defendant Josephine * * * who, in the case of each such instrument, was, and now continues to be, the promisee of any, and if any every, promise having legal effect carried, expressed or imported by such instrument and who participated with her son, plaintiff Jay Morse Ely, Jr. and her daughter [petitioner] * * *, in the plan * * *; (2) It was an essential element in, and is a condition precedent to the operativeness of, the plan mentioned in clause (1) next preceding, understood and recognized as such by defendant Josephine * * * that the latter's daughter and third child, defendant Adrienne * * *, should, within a reasonable time after attaining eighteen years of age, also join in the same plan and make, enter into and deliver to defendant Josephine * * * an instrument of like form, scope, terms, import and effect as each of the two separate instruments made, one *124 by plaintiff Jay Morse Ely, Jr. and the other by * * * [petitioner], on December 25, 1935 * * *; and (3) Consequent upon the attaining by defendant Adrienne * * * of the age of eighteen years and the lapse (without required action on her part) of a reasonable time after attaining that age and coupled with her definitive and complete refusal to join in the plan * * * and ever to make, enter into or deliver to her mother Josephine * * *, or otherwise to deliver, any instrument such as that made, entered into and delivered on December 25, 1935 by her brother, plaintiff Jay Morse Ely, Jr. and separately by her sister, * * * [petitioner], it is now equitable and essential that the instrument made December 25, 1935 by each plaintiff be, in each instance, rectified and reformed so as to include both the insertions set forth haec verba above in this pleading * * *. The plaintiffs then requested the Circuit Court to find that: because of the definitive, complete and irrevocable refusal of defendant Adrienne * * * stated above in this pleading * * *, the potential trusts * * * cannot, and can never, come into existence, effect or operation. On November 19, 1953, the Lake County Circuit *125 Court entered a decree in which it held that the Christmas Day agreements were conditional upon execution of a like agreement by Adrienne and, because of her refusal to do so, could never come into existence, effect or operation. A proceeding was instituted on behalf of the three children on July 8, 1953, in the Court of Common Pleas, Cuyahoga County, Ohio, at No. 649,944. The proceeding raised the validity and effect of the purported irrevocable assignment, dated November 2, 1926, by their father, Ely, of one-half of his remainder interest in the Morse trust. The Court of Common Pleas entered its decree in No. 649,944 on February 28, 1955. It found as a fact that the reasonable and proper compensation of the plaintiffs' counsel was $47,500, of which Wolf's firm was entitled to $32,500. The Court held that: [1] Decedent * * * Ely, the only grandchild of testator [Morse] and the sole child of the testator's daughter Carrie * * * did not take a vested remainder interest in fee simple, or a remainder interest in fee simple subject to divestment, in the corpus of the trust estate created by said will; [2] The only remainder interest in the corpus of the trust estate created *126 by said will which could have vested in decedent * * * Ely was contingent upon the happening of the following two events: the first his attaining the age of 35 years and the other his surviving his mother Carrie * * *, and since decedent * * * Ely predeceased his mother, testator's daughter Carrie * * *, one of those contingencies did not and cannot occur and, accordingly, he was entitled to nothing and at his death had no interest of any type, character or characteristics under said Morse will which could pass or did pass by assignment, conveyance or other transfer in trust, or otherwise, to defendant The First National Bank of Chicago, trustee as aforesaid, either by said indenture dated November 2, 1926, or by any other purported transfer, or which upon his death could descend or did descend as intestate property to his widow, defendant Josephine * * *, and his three children, the plaintiffs Jay Morse Ely, Jr., * * * [petitioner] and Adrienne * * *, as his sole heirs at law and next of kin; and [3] As no child or children other than decedent * * * Ely was born to the testator's daughter Carrie * * *, there are but three recipients entitled to receive distribution of the corpus *127 of the trust estate of said trust created by and under said will of Jay C. Morse, deceased, they being the three children of decedent * * * Ely, plaintiffs Jay Morse Ely, Jr., * * * [petitioner] and Adrienne * * *, as the sole remaindermen under the terms and provisions of said will and, therefore, The Cleveland Trust Company as Trustee is required and hereby directed finally to divide and distribute the entire corpus of said trust estate equally among the three here named remaindermen. In both the Lake County, Illinois, and the Cuyahoga County, Ohio, proceedings, petitioner was at all times represented by Wolf. Carrie having died on July 24, 1954, the Morse Trust estate was distributed in 1955 upon the termination of the Cuyahoga County proceedings. The trust estate had a fair market value of approximately $4.5 million at the time of distribution, of which one-third belonged to the petitioner. Prior to the termination of the Morse trust, the petitioner received income from the trust in the amount of $7,634.70 and capital gains in the amount of $1,442.61 for the period from July 24, 1954, the date of Carrie's death, to December 31, 1954. On December 22, 1955, each of the *128 three children entered into a similar irrevocable trust agreement prepared by Wolf. Under her agreement, petitioner agreed to transfer certain property, upon receipt of her share of the Morse trust, in trust for the benefit of her mother, Josephine, during Josephine's life. This trust agreement was drafted to effect an understanding between the three children that provision would be made for Josephine in lieu of the Christmas Day agreements. Supplements to the December 1955 trusts were made in February 1956, increasing the corpus of each trust by the irrevocable transfer of additional property. For services rendered by Wolf from 1947 to 1954 in regard to Carrie's life interest in the Morse trust, she paid him during the years 1951 through 1954 the sum of $130,000. For services rendered in the Cuyahoga County, Ohio, proceeding, No. 649,944, the trustee of the Morse trust, pursuant to the court's order in its February 28, 1955, decree, paid to Wolf's firm $32,500 from the corpus of the trust. This amount was paid in three installments, on December 31, 1954, April 4, 1955, and May 31, 1955. The trustee of the Morse trust also paid Wolf, as counsel for petitioner and Jay, Jr., *129 $15,000 for services rendered in the Lake County, Illinois, proceeding, No. 58551. For services in the administration and management of the Morse trust prior to Carrie's death, the trustee of that trust paid Wolf, after the interests of the three children had vested, $5,000 in December 1954 and $15,000 in December 1955. The trustee also made payments to Wolf of $7,500 on December 1, 1953, and $10,000 on November 15, 1955, for legal expenses in connection with the Morse trust. Wolf had participated in management and investment decisions of the trustee on behalf of the beneficiaries, the three children and Carrie. Wolf strongly urged the trustee to retain large blocks of oil stocks which it had inherited when it became successor trustee. The trustee did so, contrary to its ordinary procedure, and the principal substantially appreciated in value over the years. Throughout the years from the 1930's until the termination of the trust in 1955, the trustee furnished Wolf copies of the trust accounts for Wolf's examination and information. On December 23, 1955, the three children jointly signed and sent to Wolf the following letter: On the basis of payment agreed to in the sentence *130 following, we each hereby confirm that you are entitled to payment from each of us, separately, of $35,000, being $105,000 in the aggregate, for your greatly appreciated professional services in obtaining, within the year of the life tenant's death, legal determination of the interest of each of us under the will of Jay C. Morse and, consequent upon that determination, early distribution of the trust estate free of trust. This is with the understanding on the part of each of us that the obligation of each for his or her share of the above mentioned services is a separate obligation, not joined with that of any other, to pay you, on or before December 31, 1957 at such times and in such installments as each in the full exercise of his or her choice and discretion may and shall determine, the sum of $35,000. Fairman, on April 12, 1956, sent a check for $8,500 to Wolf, accompanying it with the following letter: I attach, herewith, * * * [petitioner's] check in the amount of $8,500.00 which represents a partial payment of funds due you for agreed upon services. For her records, kindly acknowledge with some type of breakdown. As an enclosure in a letter dated April 14, 1956, thanking *131 petitioner for the payment, Wolf sent the following receipt: Received this 14th day of April, 1956 from * * * [petitioner] the sum of $8500 on account of her separate obligation to the undersigned referred to in the instrument dated December 23, 1955 and joined in by her. By the payment of which receipt is now acknowledged that obligation stands reduced to $26,500. On April 11, 1957, Fairman wrote Wolf: I would like very much to have you write me an opinion that the legal fees paid by * * * [petitioner] in regard to the Jay C. Morse Trust are allowable deductions for my 1956 Federal Income Tax Return. Also please advise when the remaining amount will be due for 1957. A notation on the margin of the letter reads as follows: 4-12-57. Mr. Fairman called back and I explained that the deduction was available to her in a joint or separate return but to him only through a joint return and therefore the word "my" is either incorrect or if meaning "our" confusing. In 1956, petitioners paid Wolf $17,000 of the $35,000 agreed to on December 23, 1955. The remaining $18,000 was paid to Wolf by petitioners in 1957. In their income tax returns for 1956 and 1957, petitioners claimed *132 the following deductions for attorneys' fees: Year
Amount
1956
$17,000
1957
18,000
Total
$35,000
In his deficiency notice, respondent determined that "said attorney fees do not represent an allowable deduction in computing your taxable income." Opinion Relying solely upon section 212(2) of the 1954 Code, [3] petitioners claim deductibility for the $35,000 in legal fees paid Wolf in 1957 and 1958. Petitioners concede that the legal expenses are not deductible under section 212(1), and we agree. See Ellsworth M. Statler, 25 T.C. 1175 (1956). Section 212(2) requires that the expenses for which deductibility is sought be ordinary and necessary expenses paid or incurred "for the management, conservation, or maintenance *133 of property held for the production of income." Petitioners contend that the fees were paid for the "management" of "property held for the production of income," and that therefore they should prevail under Trust of Bingham v. Commissioner, 325 U.S. 365 (1945). Petitioners' reliance on Trust of Bingham is misplaced, for that case is clearly distinguishable on its facts. There, the attorneys' fees were incurred by the trustees themselves in distributing the trust fund, which distribution was a duty explicitly imposed upon the trustees by the terms of the trust. Here, petitioner is only a contingent remainderman [4] seeking to deduct legal fees incurred, in some unascertainable part, in connection with a trust in which, at the time the expenses were incurred, the petitioner had no interest other than obtaining a portion of the trust if she survived the income beneficiary. See Marion A. Burt Beck, 15 T.C. 642, 669-670 (1950), affd. per curiam 194 F. 2d 537 (C.A. 2, 1952), certiorari denied 344 U.S. 821 (1952). *134 Moreover, we are of the opinion that the petitioner, at the time the legal expenses were incurred, did not possess "property held for the production of income." It is true that a contingent remainder interest has been held to be "property." See Helvering v. Reynolds, 313 U.S. 428 (1941); cf. Haywood v. Gill, 313 F. 2d 454 (C.A. 4, 1963). Nevertheless at the time the legal expenses were incurred, [5] the property was not "held for the production of income" to the petitioner; rather, it was held by the trustee for the production of income to Carrie, the life beneficiary of the trust. The statute requires that the property be held for the production of income to the taxpayer claiming the deduction. Frederic A. Seidler, 18 T.C. 256, 260 (1952); Joseph Lewis, 27 T.C. 158, 164 (1956), affd. 253 F. 2d 821 (C.A. 2, 1958); Ellsworth M. Statler, supra; see also Helvering v. Stormfeltz, 142 F. 2d 982 (C.A. 8, 1944), modifying and remanding a Memorandum Opinion of this Court. We thus conclude that petitioners are not entitled to deduct any part of the legal fees. *135 In addition, other factors also militate against allowing the claimed deduction. Section 212 is "comparable and in pari materia" with section 162 of the 1954 Code, Trust of Bingham v. Commissioner, supra; see Bowers v. Lumpkin, 140 F. 2d 927 (C.A. 4, 1944); and provides "for a class of deductions 'coextensive with the business deductions allowed by [section 162], except for' the requirement that income-producing activity qualify as a trade or business." United States v. Gilmore, 372 U.S. 39, 45 (1963). See H. Rept. No. 2333, 77th Cong., 2d Sess. (1942), p. 75; S. Rept. No. 1631, 77th Cong., 2d Sess. (1942), p. 88. In order to qualify for deductibility, an expense must be ordinary in character, see Stella Elkins Tyler, 6 T.C. 135 (1946), and reasonable in amount. Northern Trust Co. v. Campbell, 211 F. 2d 251 (C.A. 7, 1954). The expense incurred must be proximately related to the management of the property, see Nancy Reynolds Bagley, 8 T.C. 130 (1947); Bertie Charles Forbes, 18 T.C. 321 (1952), affd. 204 F. 2d 777 (C.A. 2, 1953), certiorari denied 346 U.S. 872 (1953), and must *136 have been paid or incurred by the taxpayer claiming the deduction. In determining whether the petitioners have met these requirements of section 212, it is our duty to carefully scrutinize the facts, see Manufacturers Hanover Trust Co. v. United States, 312 F. 2d 785 (Ct. Cl., 1963), recognizing that the burden of proof is upon the petitioners. Assuming, without so finding, that the fees were ordinary in character, see Welch v. Helvering, 290 U.S. 111 (1933), we encounter difficulty as to the reasonableness of the amount. As respondent asserts, we have been left in the dark as to the purpose for which the legal expenses were actually incurred. If the expenses were incurred for investment and management advice, then they were, in large measure, expenses of the income beneficiary and the trust itself - both of which generously compensated Wolf. [6] If the expenses were incurred in the Ohio or Illinois proceedings, the trustee adequately compensated Wolf. [7] If the expenses were incurred in an early construction of the will in order to, as petitioners contend, save the $8,000 annual trustee's fees, then even if the will was construed three years early, the *137 total trustee's fees would have been only $24,000, a third of which would have been attributable to petitioner. And a spending of $35,000 in order to save $8,000, in these circumstances, does not appear reasonable. In fact, the petitioners have not convinced us that the payments to Wolf were not voluntary. Petitioners offered no proof, and we are unable to find, that the contingent remaindermen made any written, or even oral, promise to compensate Wolf until December, 1955 - several months after the trust, and all legal services connected with it, had terminated. As we have noted, the legal services performed by Wolf seem, in large part, to have been for the income beneficiary and the trust itself, and Wolf was well paid by both. With these factors in mind, we believe that petitioners' obligation to Wolf may well have been incurred voluntarily. Cf. Charles F. Neave, 17 T.C. 1237 (1952); Anstes v. Agnew, 16 T.C. 1466 (1951). *138 In addition to the limitations inherent in the language of section 212, there are two other limitations superimposed by the Code. See section 261, I.R.C. 1954. On the one hand, no deduction is allowed for "personal, living, or family expenses," section 262, I.R.C. 1954; United States v. Gilmore, supra, and, on the other hand, no deduction is allowed for a capital expenditure. Section 263, I.R.C. 1954; section 1.263(a)-2, Income Tax Regs.; Brown v. Commissioner, 215 F. 2d 697 (C.A. 5, 1954), affirming on this issue 19 T.C. 87 (1952). Some portion of the expenses seems to have been incurred primarily for petitioners' personal reasons. The three children were interested in providing income for Josephine, their mother, and at least part of the petitioner's legal expenses were incurred in the various proceedings and actions regarding the amount eventually decided to be given Josephine. See Lykes v. United States, 343 U.S. 118 (1952). "This was a personal or family purpose and the expenses incident to its accomplishment were personal." *139 Joseph Lewis, supra, at 164; see also, Georgia Leary Neill, 42 T.C. - (July 24, 1964). Undoubtedly, some part of the legal expense was incurred for the construction of the Morse will. As such, that amount, if ascertainable, would not be deductible, but rather would constitute a capital expenditure to be added to the basis of the assets received by petitioner. See Robert L. Wilson, 37 T.C. 230 (1961), affd. per curiam 313 F. 2d 636 (C.A. 5, 1963); Erdman v. Commissioner, 315 F. 2d 762 (C.A. 7, 1963), affirming 37 T.C. 1119 (1962). As petitioners have introduced no evidence by which it is possible to allocate that portion of the legal expense attributable to the will construction, we must find that the legal expenses are nondeductible and may not be capitalized. See Joseph Lewis, supra, at 165; Lawrence v. O'Connell, 141 F. Supp. 316, 321 (D.R.I., 1956), affd. 238 F. 2d 476 (C.A. 1, 1956); E. W. Brown, Jr., 19 T.C. 87, 92 (1952), affd. on this issue 215 F. 2d 697 (C.A. 5, 1954). Decision will be entered under Rule 50. Footnotes
1. Although it was stipulated that Fairman presently resides in Chicago, Illinois, he testified that he presently lives in Fairfield, Connecticut. Moreover, the respondent requested a finding that Fairman presently resides in Fairfield, Connecticut and the petitioners, in spite of the opportunity available to them, did not object to the requested finding.↩
2. The Indemnity Agreement refers to Carolyn Morse Ely. Other evidence indicates, however, that Carrie, the name we have used throughout our findings, is her commonly-used name.↩
3. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; or (3) in connection with the determination, collection, or refund of any tax.↩
4. Petitioners and respondent are agreed that the petitioner was a contingent remainderman. We accept the designation.↩
5. Although the legal expenses were paid in 1957 and 1958, the agreement was signed by the petitioner in 1955 and was for services rendered, according to Fairman's testimony, "back to the early '30s."↩
6. As we have found, Carrie paid Wolf $130,000; and the trustee paid Wolf at least $20,000 for services in the administration and management of the trust prior to Carrie's death. ↩
7. Wolf was paid a total of $47,500 for services rendered in the two proceedings.↩